Exhibit 2

# ENGINEERING, PROCUREMENT AND CONSTRUCTION (EPC) Contract

## For

## Planning and Construction of the

## PV Power Plant "Solaris" 12,5 MWp

## in Puerto Sandino, Nicaragua





Between


**MKG GmbH Montagebau Karl Göbel**

Pfaffenmuehlweg 86
D-74613 Oehringen (Germany)


hereinafter collectively referred to as **"Contractor"**

and

**Gespa Nicaragua, S.A.**

Pista Suburbans, costado Oeste del Monumento Memorial Sandino
Managua (Nicaragua)


Hereinafter collectively referred to as **"Principal" or "Client"**

The Principal and Contractor are hereinafter referred together as the **"Party"** or **"Parties"**.


## 1) Preliminary remarks

1.1.   The Principal is planning to erect a PV Power Plant (PV Plant) next to "Planta Che Guevara 9" located at Puerto Sandino in the municipal area of Nagarote, in the region Leon, Nicaragua. The PV Plant is contracted to sell the produced energy to the two National distribution companies Disnorte and Dissur.

1.2.   The Principal is responsible for all authorizations which are required for the erection and grid connection of the PV Plant. The Principal will provide the Contractor with copies of all necessary authorizations, drafts and information concerning the erection and grid connection of the PV Plant.

The Principal will ensure that the land owners have granted Principal and Contractor unlimited access to site throughout the period of the construction and the that land owner has cleaned the land, including but not limited to removal of any vegetation, materials and rubbish. Furthermore, the Principal must ensure access for trucks (payload 40 t) and mobile cranes (120 t).

1.3.   The Contractor is responsible for the turn-key delivery of the PV Plant according to the Scope of Works, as defined in Clause 4 of this Agreement and the documents referenced therein. Furthermore, the contractor is responsible for the choice of materials under consideration of the local technical rules and regulations and the requirements of the Principal.

2

1.4.   The installed minimum capacity of the PV Plant is 12.5 MWp.

1.5.   The Contractor is active as a worldwide EPC contractor in design and construction of PV plants.

1.6.   The Principal is co-investor of this PV Plant.

## 2   PRINCIPAL'S OBLIGATIONS

The Principal shall perform the following obligations:

### 2.1   Access to and Possession of the Site

The Principal and owner of the Site shall grant the Contractor access to and possession (but not exclusive possession) of the Site on or before the date specified in the Project Schedule, or, if no date is stated in the Project Schedule, on the date of the Notice to Proceed.  All rights of access, possession and control of the Site shall be subject to such limitations as to use as may be stated herein or may otherwise be reasonably imposed by the Principal.  For all purposes of this Agreement, the Principal undertakes to grant or cause to be granted all necessary easements, rights of way or usage in connection with the Site to enable the Contractor to perform its obligations under this Agreement.

If, in order to render the performance of the Work, it will be necessary to make use of land which is not part of the Site, the Principal will obtain the permission from the relevant owner, at Principal's cost, in consultation with the Contractor.

### 2.2   Consents, Approvals, Permits and Licenses

The Principal shall obtain all the consents, approvals, permits and licenses and make the applications required for the PV Plant and Work.  The Principal shall promptly provide the Contractor with such information and assistance as the Contractor shall reasonably request, and shall promptly sign (if required) such documentation as shall be required, in order to enable the Contractor to apply for and obtain any necessary and proper permits, licenses or exemptions.

### 2.3   Imported equipment

With respect to all imported equipment and materials for the PV Plant, as well as Contractor's equipment and machinery, the Principal shall as and when necessary to support the Project Schedule and the performance by the Contractor of the Work, assist the Contractor for all Port Authority of Nicaragua, customs-clearing procedures; and in connection with the foregoing, sign all applications and other documents required by the Port Authority of Nicaragua, Custom Department and BOI, which is prepared and will be submitted by the Contractor.  It is agreed and understood between the Parties, that the Principal shall, to the extent allowed by law and Principal's rights, apply for any applicable exemptions, waivers, credits or other relief or

3

discount applicable to customs duties, tariffs, taxes, import or export fees, or other charges on equipment or materials imported by the Contractor for the PV Plant and related Work.

**3)     CONTRACTOR's obligations**

**3.1)    General Obligations**

3.1.1   Contractor is responsible, on a fixed-price per kWp basis for the design, engineering, construction, installation, erection, testing, commissioning until Planta Che Guevara 9, completion, and during the Defects Liability Period, rectification of defects in, the Facility, the supply of all PV Plant and Contractor's equipment, customs clearance for and on behalf of the Principal, loading and unloading, delivery to the Site, installation and incorporation of the PV Plant in the Facility. All as more fully described in the **Scope of Works** detailed in Clause 4 of this Agreement and the documents referenced therein. (collectively referred to herein as the "Work").

The PV Plant shall be initially assessed at the expected nominal output measured in Wp/DC under standard testing conditions as per IEC 621215; accordingly, the total actual output may vary upwards or downwards, in accordance within those tolerance limits adjusting the price accordingly. The final nominal in Wp/DC will be determined by the flash reports delivered by the Sunowe.

3.1.2   The **List of components** and **Datasheets** of all the main components is annexed to this contract.

Without prejudice to or limitation of the Contractor's general obligations with regard to the Project, the Contractor shall perform the following specific obligations:

**3.2     Engineering and Design**

The Contractor shall be responsible for the design and engineering of the PV Plant and of the Work to the extent and in accordance with the requirements of the Specifications and all applicable laws, regulations, building codes and industry standards.

**3.3     Land**

The PV plant will be erected on the land/site designated by Principal (the "Site").

The Contractor has already inspected the designated Site. Any peculiarities of the Site have or will be taken into consideration by the Contractor in the detailed planning.

**3.4     Construction and Construction Management**

The Contractor shall supervise and be responsible for the timely performance of the Work and the construction of the PV Plant in accordance with the



Specifications, the Project Schedule and the other terms and provisions of this Agreement. The Contractor will use all reasonable efforts to co-operate and integrate the performance of the Work with the works and activities of the Principal, the Authorities, Utility suppliers and other contractors, *i.e.* Albanisa Generation S.A., involved in the Project and any other Person that the Principal may reasonably stipulate in connection with any matters affecting the Project, including without limitation, the interconnection requirements.  If and to the extent that these co-operations require performance of work that materially differs from or is in addition to the Scope of Work and/or Specifications, the Contractor shall be entitled to a Variation Order for any additional costs and extension of time.

3.5     **Documentation and Manuals**

The Contractor shall deliver to the Principal copies of all Design Documents, plans, schematics, materials descriptions, specifications and warranties and manuals according to section 8.3.

3.6     **Labor and Personnel**

The Contractor shall, unless otherwise provided in this Agreement, make its own arrangements for the engagement of all labor and for their payment, social welfare costs, insurance, feeding and transport to and from the site of construction.

Principal and its shareholders have agreed to accommodate all workers of the Contractor – presumably in AlbaCity near Puerto Sandino.

3.7     **Delivery**

Unless otherwise notified in writing by the Principal, the Contractor shall not require permission from the Principal to make any deliveries to the Site.  The Contractor shall be responsible for the reception on the Site of the PV Plant and the Contractor's equipment.

3.8     **Storage, Water, Electricity to the construction site and Related Matters**

The Contractor shall provide appropriate storage facilities (in accordance with manufacturers' recommendations and the prevailing circumstances) and shall obtain and dispose of, as appropriate, all soil, gravel and similar materials required for completion of the PV Plant.

Principal and its shareholders will provide Water and Electricity to the construction Site.

3.9     **Site Access**

No Persons other than the employees of the Contractor and its Subcontractors shall be allowed on the Site, except with the consent of the Principal.  The principal and/or Albanisa will provide a security service during the construction time. The Contractor shall at all times prior to the Taking



5

Over of the PV Plant be responsible for the proper maintenance of Site security and shall, prior to the commencement of Work at the Site, deliver to the Principal or the Consulting Engineer, for approval, a copy of its proposed procedures for allowing its employees, and those of its Subcontractors, to have access to the Site.  Notwithstanding the foregoing, the Contractor shall at all times permit the Principal, the Principal's Representative, the Lenders' Engineer and its representatives, any other representative of the Lenders and other authorized Persons and officials designated by the Principal to enter upon the Site for the purpose of inspecting the Site, the PV Plant or the Work to the extent that the presence of such Persons on the Site would not reasonably be expected to disrupt the performance of the Work.

### 3.10   Subcontractors

The Contractor has the right to subcontract the whole or any part of its obligations under this Agreement to Subcontractors, longstanding partners, and other qualified Persons without the prior approval of the Principal.

### 3.10   Personnel Training

Contractor is responsible for the training of construction and Operating Personnel and for the provision of all other work and ancillary services required for completion of the PV Plant as a complete and fully functioning unit (i.e. "turn-key"), in each case, in accordance with the provisions of this Agreement, the standards specified herein, applicable industry standards and applicable laws and regulations.

## 4)   Scope of Work

### 4.1)   General clause

The Contractor must render all Work that is required for technical planning and erection of the PV Plant on a turn-key basis, tested, commissioned and ready for use, in accordance with the performance, project description and Scope of Work. All Work shall be performed in a workmanlike manner in accordance with the specifications of the manufacturer(s), the specifications of the Principal, applicable industry standards and applicable laws and regulations.

Possible changes from the original planning that may become necessary for technical reasons must be notified to the Principal in a timely manner before commencement of construction or changes. The written consent of the Principal must be obtained for such changes, as more fully described in Clause 4.3(8) below.

### 4.2)   Scope of Work in detail

The performance of the Contractor comprises in particular, to the extent that no other arrangements have been agreed upon by the Principal, the **Scope of Work** that is attached to this Agreement as **Appendix 2.2.1**. The Scope of Work describes also the technical details, performance requirements and

6

specification of materials. The **List of Components and data-sheets** is also annexed to this contract as **Appendix 2.2.2.**

**4.3)    Ancillary services**

Within the framework of the Work to be provided by the Contractor, Contractor shall provide the following non-exclusive services:

(1)    Designating a site manager, a person and/or Company with competence for labor protection, and other supervisors and inspectors, who may be required under Nicaraguan law, and if necessary under applicable German law.

(2)    On Site temporary facilities during the construction period

(3)    Delivery, collection and removal of equipment, machines, scaffolding and materials, including keeping it available and securing the Site.

(4)    Compliance with all applicable safety regulations at the construction Site and the health and safety regulations, especially with the mandatorily applicable industrial safety regulations prevailing under Nicaraguan law (and if necessary under German law).

(5)    During the entire construction period until completed, commissioned and delivered to the Principal, the Contractor must discharge its obligation of ensuring safety related to the Work performed by the Contractor or its subcontractors.  Contractor must take the required preventive measures in accordance with the pertinent regulations, such as the construction, fire and labor laws and regulations.  The Contractor commits to maintaining the construction Site in an orderly and clean condition, as dictated by the weather and circumstances, including the regular cleaning, as may be required, of any and all access roads within the site and the junctions with public highways, and other premises directly affected by the construction.

(6)    The Contractor is responsible for managing, coordinating and supervising all activities performed by the Contractor under this Agreement.

(7)    The Contractor must render and/or supply services, materials and equipment that are required to complete the entire PV Plant and the Work on a turn-key basis and in a ready-for-use state and for which no alternative arrangements have been made in this Agreement, in a quality that is of equal standard as the remainder of the Project.

(8)    The Work must be performed by the Contractor in coordination with the Principal.  Changes by the Principal regarding the Scope of Work must be separately agreed in writing by email, especially if the changes could result in a price increase or a longer construction time.  If the Principal does not give his consent to the proposed changes within 14 days, the proposed changes shall be considered rejected and the Contractor will perform the Work as specified in the original Scope of Work.  Thereafter, the Principal shall assume the full responsibility, consequences and risk resulting from rejection

7

of the proposed changes by the Contractor, and the Contractor shall be relieved and indemnified by the Principal for any loss arising therefrom.

(9)     The Contractor shall assist the Principal in getting the acceptance by the utility companies by providing a technical description of the plant and components. The Principal itself is responsible for all requests, authorizations and documents to or for the utility company.

(10)    The Contractor must ensure the availability of relevant data transfer connections/possibilities for the remote surveillance system of each PV Plant Installation.

## 5)   Implementation & Site Management

### 5.1)  Construction and project management

The Contractor must ensure that during the entire construction and implementation period, qualified management staff will be available in sufficient numbers for supervising the performance of the Work and shall insure that the staff are trained and equipped in accordance with the equipment manufacturers' instructions and the prevailing industrial safety regulations.

5.2     The Contractor shall create and organize the technical layout and technical planning, the construction site planning, planning of the construction site facility area, the organisation of the construction and supervising, the coordination of the acceptance and test operation phase. The Contractor is also responsible for the construction insurance. The construction insurance must be valid until one (1) month after acceptance.

### 5.3)  Progress reports and Construction meetings

The Contractor shall, every two weeks, prepare formal written and quantitative reports to the Principal describing the progress of the Work by reference to the Milestone Schedule and the Project Schedule in a format and in sufficient detail to enable the Principal to assess performance, plan inspection dates and evaluate forecasts, including reports on key subcontracts (as applicable) and otherwise in form and substance satisfactory to the Principal.

When needed, the Contractor can call for extraordinary construction meetings for the purpose of discussing technical questions and potential problems and obstacles in relation to the Work and/or the PV Plant. For that purpose, the Contractor and the Principal must each designate an appropriately authorised person. Minutes shall be taken by the Contractor of every construction meeting, which will be sent forthwith to all participants. In case of disagreement, the Principal must, within 14 days of the receipt of the minutes, object to erroneous, inaccurate or incomplete minutes; otherwise, the minutes are considered to be correct and to have been approved.

## 6)   Contract price and payment

**6.1)   Contract Price**

(1)   The Contractor provides to the Principal the Work for a turnkey PV Plant for the fixed price of

**11.809.051,70 € net (excluding taxes)**

The Contract Price of   11.809.051,70 € net (excluding taxes) is calculated according the the following formula:

a fixed price of 944,72 € per kWp installed multiplied by the assumed installed capacity of approximately 12,500 kWp (12.5 MWp). The installed capacity will be documented in accordance with the flashing lists, and the Parties hereby agree to adjustment of the final price in accordance therewith, using this prescribed formula.  The fixed price, as adjusted, shall be referred to herein as the "Contract Price."

(2)   The Contract Price includes only the turnkey construction, testing and commissioning of the PV Plant, ready for operation as described in the Scope of Work **(Clause 4 and related documents)**

(3)   The Parties hereby agree to a Payment Plan of initial, interim and final payments based on the Contract Price, regarding final lump sum compare below point 6.1) (4)

| | |
|---|---|
| 1st Payment upon signing this contract: | 2.818.700,92 € |
| 2nd Payment before shipping components | 2.818.700,92 € |
| 3rd Payment starting construction activities | 1.127.480,37 € |
| 4th Payment by delivery panels | 1.691.220,55 € |
| 5th Payment by finishing technical construction | 2.522.084,74 € |
| 6th Payment by acceptance | 830.864,19 € |

(4)   Upon agreement on the work schedule, the Parties may incorporate "milestone payments" as fixed in the work schedule.  In the event the Parties agree to milestone payments, then any such payments shall be credited against the appropriate interim scheduled payment specified in clause 6.1(3) above.

(5)   All Payments shall be due and payable from the Principal, in immediately available Euros, net of any applicable taxes or fees, at the account designated by the Contractor, within five (5) calendar days of accomplishment of the specified event, without need of notice or demand by the Contractor.

**6.2)   Variations, Changes in performance**

The Principal may, by Variation Order to the Contractor at any time during the performance of the Work, instruct by written notice the Contractor to alter, amend, omit, add to or otherwise vary any part of the Work which are likely to increase or decrease the Contract Price and/or any change in the Construction Schedule.   The Contractor shall not vary or alter the Specifications, the Project Schedule or any other part of the Work, except in accordance with a Variation Order from the Principal.

The Contractor may, however, at any time propose variations of the Work to the Principal if it becomes aware of significant new developments in technology which are applicable to the Plant or its being designed, engineered, constructed or operated in accordance with the best practices and methods generally applicable in the solar power plant industry.

Any official requirements or specifications of the grid operator (Enatrel) or other Authorities that are imposed and are not contained in the project description or Scope of Work, and must be carried out by the Contractor is subject to an adjustment in the Contract Price. This also applies in respect of extra costs that are incurred as a result of requirements that are imposed in conjunction with issuing any permits necessary for the construction, testing and operation of the PV plant.

The construction schedule will be appropriately extended in accordance with the extra time that will be required on account of the changes in the Work that must be rendered. A claim for adjustment in the Contract Price will be void, if the Contractor is responsible for the circumstances that have led to the increase in requirements.

Prior to the Principal issuing a Variation Order, the Principal and/or Contractor shall notify each other of the nature and form of the proposed Variation.  As soon as practical after having received such notice, the Contractor shall submit to the Principal, a description of the Work, if any, to be performed in connection with such Variation, and a program for its execution; the Contractor's proposals for adjustment to the  Contract Price and the manner in which the Contractor is to be paid the amount of such adjustment, or the Project Schedule which is reasonably required by the proposed Variation Order and, if any change in the  Contract Price is contemplated, and the amounts and dates or proposed Milestones for such payments.

The Principal and the Contractor shall each use their best good faith efforts to agree on any reasonable (i) valuation of a Variation and manner or payment of such, (ii) alteration of the Milestone Schedule, Project Schedule or Scope of Work.

**6.3)**    **Completion guarantee**

The Contractor will provide a completion guarantee – if required – of 10% of the Contract price subtracted the value of the modules. The percentage might change if the Client has to provide a completion guarantee in a higher amount

but should not exceed 15% of the Contract price subtracted the value of the modules.

## 7) Implementation periods

### 7.1) Commencement of Work

The Contractor has already provided preliminary technical planning and will perform the final technical planning after signing of this Agreement by all Parties, in accordance with the PV Plant application/building permit and stated objectives of the Principals. If any changes from a technical or legal aspect are necessary, the Principal shall be notified by the Contractor without undue delay.

The Contractor will start with the construction once all the necessary authorizations and the building permits has been received. The Contractor will start with the construction at the Site within approximately 4-6 weeks, in consideration of the shipment time from equipment and materials sources and the customs clearance procedures. The Contractor shall notify the Principal in writing before setting up the construction site and before beginning the Work activities. Upon beginning of construction, the Contractor shall provide a report of "Beginning Construction" to the Principal.

In the event that the Contractor cannot begin work under this Agreement, or if the construction work must be interrupted, due to causes or reasons which the Principal is responsible, the Contractor shall be entitled to delay the start of construction work until the cause of the delay has been resolved and the Principal has confirmed in writing that such is the case. If such delays due to causes for which the Principal is responsible occur during the construction and the Contractor must interrupt the construction work, the Principal must pay an amount of Euros 5,000.00 per day liquidated damages, which sum shall be unconditionally tendered to the Contractor prior to resumption of construction work.

In the event delays due to causes or reasons for which the Principal is responsible continues for more than three (3) weeks, the Contractor will be entitled to leave the construction site. Thereafter, upon the occurrence of conditions which would allow the resumption of construction work under the agreement, the Contractor shall be allowed three (3) weeks from that time to resume construction the Site.

Any delays and / or interruptions of work will extend the construction schedule and milestones by an amount of days equal to the duration of those delays and / or interruptions.

### 7.2) Commissioning

Commissioning will be considered to have been successful when the PV Plant is capable of delivering power into the grid. Commissioning must be

11

notified in writing by the Contractor to the Principal in conjunction with information about the anticipated beginning of test operations. The Contractor will coordinate all required switching actions and acceptance tests that may be required.

After commissioning, there will be test operations lasting no longer than five (5) days, in accordance with the test operations procedure. Test operations will be considered to have been completed successfully, when the items of the test operations procedure have been complied with. If not, the period for test operations will be extended for as long as is necessary for a successful completion of test operations.

**7.3)   Completion**

The PV Plant shall be considered as Completed and Accepted by the Principal upon completion of all Work, Commissioning and successful testing, and resolution of any deficiencies of the PV Plant.

**7.4)   Form of Acceptance**

In principle, Acceptance will be a formal matter, and will keep in a written minutes of meeting. If there is formal Acceptance, the Acceptance record must be completed upon Acceptance of the PV Plant and signed by the Contractor, the Principal, the Guarantor/Lenders and the Client

The Contractor shall notify the Principal in writing of the date of the Acceptance not less than 14 days before the Acceptance ceremony. If the Principal does not attend the Acceptance ceremony, although the Contractor has informed the Principal in writing, the Acceptance is valid.

**7.5)   Partial acceptance**

The Contractor may have the right of demanding partial Acceptance. The form of partial Acceptance is according to clause 7.4

**7.6)   Taking Over**

After Completion and Acceptance of the PV Plant as described in clause 7.3 above,  and the Principal and the Consulting Engineer have determined, after consultation with the Contractor, that the PV Plant can be operated safely and in compliance with the relevant operating permits and the Specifications, and that no long term harm or damage will result to the PV Plant  by the Principal continuing to run and operate the PV Plant, a Taking-Over Certificate shall be issued by the Principal to the Contractor.  The Taking-Over Certificate to the Contractor shall state the date on which the operations and control of the PV Plant will be assumed by the Principal.  Notwithstanding the date on which the Taking-Over Certificate is issued, the Taking-Over date shall always be the date when completion of test operations is successful.

**7.7)   Delay damages**

If commissioning is delayed beyond the completion date as defined in This Agreement and its related documents due solely to causes and circumstances for which the Contractor alone is responsible, then the Contractor shall owe demurrage (delay) damages in the amount of USD $2,400.00 per day for each day of delay.  The total of any and all delay damages for which the Contractor can be charged shall be limited to not more than ten percent (10%) of the Contract Price.

**8)   Documentation**

After Acceptance, Taking Over and complete settlement and payment of the Contract Price, the Contractor shall provide to the Principal complete site and technical documentation.

- All site reports and all written records
- All Manuals of the installed technologies
- All Drawings
- All Cessions of warranties and Guaranties
- Installation diagrams
- Operating instructions and procedures
- All documentation pertaining to warranty and guarantee obligations of the manufacturers of all equipment used within the Client Installation

**9)   Claims for Deficiencies and Liability**

**9.1)   Warranty**

Contractor warrants and guarantees to Principal that the following components shall be free of defects in materials and workmanship, to wit:

- PV modules:  ten (10) years product guaranty (materials and workmanship warranty), 12 years 90% power output warranty and 25 years 80% power output warranty (see guaranty statement)

- for inverters: ten (10) years (guaranty statement)

- for MKG structure: ten (10) years (guaranty statement)

- for other parts two (2) years

Any claims for guaranty against manufacturers of any components remain unaffected by this Contractor's warranty, except for counterclaims by the manufacturer(s) for faulty or improper installation by Contractor and/or sub-contractors.

The contractor shall assign all manufacturers' warranty certifications regarding modules, inverters, cables and all of the other components to the Principal.

**Limitations**

13

Obligations and damages claimed by the Principal pursuant to this warranty shall be limited to repair or replacement of defective components within a reasonable time. Contractor shall not, under any circumstances, be liable for any other damages, including but not limited to fines, loss of income, loss of profits, loss of revenues, costs to cover, or any other consequential damages. Further, the obligations pursuant to this warranty are limited to claims by the Principal against the Contractor and expressly exclude claims or causes of action by any third parties.

This warranty excludes for claims due to physical damage, abuse, neglect, misuse, improper operation, improper maintenance and repair, or any other cause except for defects in materials and workmanship by the Contractor.

### 9.2) Remedial tasks

If the Principal makes demand upon the Contractor for remediation of Work by the Contractor which is not in compliance with the Scope of Work, the Contractor must properly carry out the remedial action, in accordance with the agreement. The way and method of remedying the deficiencies will be determined by the Contractor

### 9.3) Refusal of remediation of deficiencies

The Contractor may refuse to remedy a deficiency, if doing so would require a disproportionate effort. This would be the case if an objectively minor interest of the Principal in deficiency-free performance of the agreement would, whilst weighing all circumstances, be juxtaposed against a very significant and therefore comparatively inappropriate effort for remedying the deficiency. The right of the Principal to apply deductions shall remain unaffected by this.

### 9.4) Exercising withholding rights

If the Principal makes demand for remediation of deficiencies for which the Contractor is responsible, the Principal must specify in detail the type and location of the deficiencies in writing. Verbal notice or communication of claimed deficiencies will not be valid. If the claim for remediation of a deficiency by the Principal determined to be valid, then the Principal shall have the right, at its option, of withholding only an amount that is needed for remedying the deficiency, until the deficiency has been remedied. If remedying the deficiency would require disproportionate efforts, the Contractor may elect, at Contractor's option, to apply a reduction to the Contract Price. The Contractor may elect not to perform the remediation if the remediation effort is disproportionately high, using the test of reasonable circumstances; or the importance of the deficiency may be deemed immaterial or unrealistic in terms of its impact on the operations of the photovoltaic installation; or, if the request of the Principal for remediation is grossly unreasonable.

### 9.5) Substitute remediation

14

If the Contractor elects to decline the demand of the Principal to remedy a deficiency within a reasonable period, and after an additional period of at least two weeks has lapsed, the Principal may have the deficiencies remedied at the expense of the Principal.  The Principal's right to recover said costs shall be limited to the fair and reasonable market value of the remedial work.

**9.6)   Period of limitation for claims for deficiencies**

Except as expressly described in this Agreement, the period of limitation for all mutual claims between the Parties, including any claims for remediation of under guaranty, is two (2) years. The period of limitation commences for all claims upon successful commissioning of the installation, which shall be logged.

**9.9)   Force majeure**

An "Event of Force Majeure" shall mean any circumstances not within the reasonable control, directly or indirectly, of the Party affected, but only if and to the extent that (i) such circumstances, despite the exercise of reasonable diligence cannot be or be caused to be prevented, avoided or removed by such Party, (ii) such event materially adversely affects (in cost and/or time) the ability of the Party claiming that an Event of Force Majeure has occurred to perform its obligations under this Agreement, and such Party has taken all reasonable precautions, due care and reasonable alternative measures in order to avoid the effect of such event on the ability of such Party to perform its obligations under this Agreement and to mitigate the consequences thereof, (iii) such event is not the direct or indirect result of the failure of such Party to perform any of its obligations under this Agreement, (iv) such event is not an act, event or condition, the risks or consequences of which such Party has expressly agreed to assume hereunder, (v)  such Party has promptly given the other Party notice describing such event, the effect thereof and the actions being taken in order to comply with this Section.:

Subject to these provisions, Events of Force Majeure shall include, but not be limited to:

➢ war (whether declared or not), breach of the peace, revolution, internal insurrection, rebellion against government order and other disturbances of civil life;

➢ natural catastrophes, such as storms, surge tides, thunderstorms, earthquakes, hailstorms, ice storms, tornado's, typhoons, hurricanes, land-slides, volcanic eruptions, fire, delays caused by the weather, such as ice, snow, frozen soil and persistent rain;

➢ sabotage or criminal damage or theft on the Site by third parties;

➢ strikes (local, regional, national or affecting individual sectors of the economy), lock-outs or similar disputes between employees and employers, if and to the extent that they have impact on the work activities on the building

site and / or on production of the parts and machines and / or transportation that must be provided by the Contractor, except when the Contractor is able to replace with reasonable effort those workers and / or materials, who are not available on account of strike and / or above-mentioned circumstances.

**9.10) Effect of Event of Force Majeure**

(1)     When events of force majeure occur, the work schedule and delays in this Agreement shall be extended by the period that the performance is impossible, plus such time as may be required for recommencing the activities.

(2)     Neither Party shall be considered to be in default or in breach of its obligations under the Agreement to the extent that performance of such obligations is prevented by an Event of Force Majeure.

**10)   Security Interest and Reservation of Property rights**

The Contractor shall retain title to all materials, components, Work and services on the Site. Only, and not until after final Acceptance, Taking Over, full payment of the Contract Price, and complete settlement of all claims of the Contractor against the Principal, will the ownership of the PV Plant and photovoltaic installation pass to the Principal. The Parties hereto expressly agree and covenant that until all of the aforesaid conditions have been fulfilled, the Work, materials, components and PV Plant shall be considered as movables and shall have only been temporarily and provisionally mounted on the Site, and that there is no permanent fixed connection Not an immovable by destination), and that the Contractor can remove the installation on account of his retention of title, except in case(s) of partial Acceptance and/or partial Completion. It is further expressly agreed between the Parties that this shall constitute a security right in favor of the Contractor, and that the entry upon the Site by the Contractor for the purpose of removal of materials, Work and components shall NOT constitute a trespass, conversion, theft or other violation of any civil or criminal law.

**11)   Applicable Law, Language and Jurisdiction**

**11.1)  Applicable law**

This agreement is subject to the laws of Germany, notwithstanding any provisions applicable to the conflicts of laws.

**11.2)  Language of the Agreement**

The official language of the agreement is the English language. Appendices and Annexes to this Agreement will be written in the English language.

**11.3)  Waiver.**

No waiver by any Party of any one or more defaults by another Party in the performance of any provision of this Agreement shall operate or be construed

16

as a waiver of any future default or defaults by the same Party whether of a like or of a different character.   Except as expressly provided in this Agreement, no Party shall be deemed to have waived, released or modified any of its right under this Agreement unless such Party has expressly stated, in writing, that it does waive, release or modify such right.

**11.4)** <u>**Severability.**</u>

If and for so long as any provision of this Agreement shall be deemed to be judged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other provision of this Agreement except only so far as shall be necessary to give effect to the construction of such invalidity, and any such invalid provision shall be deemed severed from this Agreement without affecting the validity of the balance of this Agreement.

**11.5)** <u>**Modification.**</u>

There shall be no modification or amendment of this Agreement except by written consent of all Parties.

**11.6)** <u>**Successors and Assigns.**</u>
This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties.

**11.7)** <u>**Entirety.**</u>

With respect to the subject matter contained herein, this Agreement (i) is the entire agreement of the Parties; and (ii) supersedes all prior understandings and negotiations of the Parties including the Initial Agreement.

**11.8)** <u>**Limitation on Liability.**</u>

Notwithstanding anything to the contrary in this Agreement, no Party shall be liable in an action initiated by one against the other for special, indirect or consequential damages resulting from or arising out of this Agreement.

**12)**   **Counterparts and Coming into Force of the Agreement**

The prerequisite for the partnership between the Parties and Sunowe regarding the project in the Agreement and future projects in Nicaragua is a strong financing concept.

This Agreement is only valid when a completely homonymous EPC contract (except for the EPC Contract price) has been concluded and duly signed between Solaris S.A. and Gespa Nicaragua S.A.

Electronic document transmissions shall be deemed valid and enforceable in respect of any provisions of this Agreement.  Either party hereto may request a hard copy of this document that has been previously transmitted by electronic means.  Provided however, that any such request shall not permit the parties from performing their respective obligations and duties under EDT instruments.

**SIGNING PAGE:**

**Contractor, MKG GmbH Montagebau Karl Göbel**

Date/Location: _Managua_          Date/Location: _____
                    _29.04.16_

MKG GmbH                          MKG GmbH
Falko Schrade
Man. Director

**Principal, GESPA Nicaragua S.A.:**

Date/Location: _30/4/2016_        Date/Location: _MANAGUA, 30/4/2016_

Solaris S.A.                      Solaris S.A.
President                         Secretary

18

APPENDICES:

2.1.1   Scope of Works
2.1.2   List of Components and Datasheets of all the main components

List of components

Datasheets:

A.)     Datasheets modules
B.)     Datasheets inverters
C.)     Datasheets sub construction (Mounting system)
D.)     Site map
E.)     Guaranty arrangements for modules
F.)     Guaranty conditions inverters

**Amendment No. 001 to the EPC-Contract
AGREEMENT AMENDING AND MODIFYING THE
General Contractor Contract for the Construction of
a 12,5 MWp Photovoltaic Plant "Solaris" in Puerto Sandino, Nicaragua**

THIS **AGREEMENT** is entered into this 21st day of September, 2016 by **MKG GmbH Montagebau Karl Göbel,** Pfaffenmuehlweg 86 D-74613, Oehringen, Germany hereinafter referred to as **"Contractor",** and **Gespa Nicaragua, S.A.,** Edificio Vista Lago, Apartamento 302, de Edificio Escala 500 mts al sur, Managua Las Cumbres, Nicaragua hereinafter referred to as **"Principal" or "Client."** The Principal/Client and Contractor may hereinafter be referred to as the **"Party"** or "**Parties**".

1. **WHEREAS:**

   1.1. Client has entered into and EPC contract for the construction of 12,5 MWp Photovoltaic Plant in Puerto Sandino, Nicaragua for Solaris (the "Project"); and

   1.2. Client and Contractor entered into an EPC contract for certain materials and services for the Project, dated April 29th and April 30th, 2016 (hereinafter "EPC contract"); and

   1.3. As a consequence of certain Project financing arrangements, it is now necessary to amend and change certain of the terms and conditions of the EPC contract;

   1.4. The Parties hereto do expressly and mutually agree to the following terms and conditions, which shall amend and supersede all previous agreements and contracts between the Parties in relation to the Project:

2. **ACQUISITION OF MAIN COMPONENTS**

   2.1. In Appendix 2.1.1 "Scope of Works" to the EPC contract dated on the 29/30.04.2016 the point no. 06 "Delivery of Modules" will be delete. The Principal will purchase the panels directly from supplier. The PV Modules shall be purchased from and supplied by RECOM AG.

   2.2. Inabata Europe GmBH ("INABATA") has an owner interest in RECOM AG.

   2.3. The other main components according to the appendix 2.1.1 to the EPC Contract dated on 29/30.04.2016 shall still be purchased from and supplied by the

Contractor. However, the Contractor will supply to INABATA instead of the Principal. INABATA shall act as the direct purchaser of the Modules in 2.1. A 5% profit on the Modules is included in the EPC contract price to the Contractor. The warranty of the Modules is annexed to this agreement. The Contractor will supply all other components and work for the Project according to the specifications and prices of the Contractor.

2.4. INABATA shall invoice Client directly for the Modules and other main components for the Project acquired and delivered to the Project site, in accordance with an agreement between INABATA and Client.

## 3. EPC CONTRACT PRICE ADJUSTMENT

3.1. The original price of the EPC contract of 11.809.051,70 € is reduced to 10.613.726,47 € in accordance to **Annex 1.**

3.2. The breakdown of the total EPC budget of 10.613.726,47 € is as follows:

| | |
|---|---|
| Modules | € 5.254.424,78 (to be paid by Inabata to Recom) |
| Other components | € 4.716.165,49 (to be paid by Inabata to MKG) |
| BOS and installation cost | €   643.136,20 (to be paid by Gespa to MKG) |

3.3. Other main components to be acquired by Contractor and sold to INABATA at a maximum price of **4.716.165,49 €,** who will then sell the main components to the Client.

3.4. Principal pays **643.136,20** € directly to the Contractor. 100.000,00 € at signing of this agreement and 543.136,20 € at Commissioning.

## 4. EPC CONTRACT MODIFICATION OF PRICE CALCULATION METHODOLOGY

4.1. Because of the adjustments to the EPC contract price and structure, the Parties hereby agree to modify the methodology of calculation of sums charged by Contractor and owed by Client.

4.2. The calculation of EPC contract charges shall no longer be based on a rate times installed capacity of the PV Plant, but on a fixed price for the entire delivery by the Contractor, including all Components, BOS and installation work as defined in the scope of works, except for three items: a) the transportation cost of goods and machinery and b) drilling cost and c) Other costs. Regarding transportation cost Contractor will provide the offers and consult with the Client before ordering the transportation. The transportation cost included in the EPC contract price is 305.000,00 € for the transport of all components, machinery and tools from Rotterdam to the Construction site.

Regarding the drilling cost, this will be based on the actual cost of drilling fixed at 35 EUR per drilling per pile. Currently 2.500 drillings equal to 87.500 € is included in the budget. Regarding other costs, an amount of 62.500,00 € is included in the EPC contract price, covering service roads and drainage work.

## 5. LIST OF COMPONENTS AND DATA SHEETS

5.1. CONTRACTOR will provide a detailed Master document line-by-line showing the budgeted cost and used for procurement control, the final budget follow-up, customs clearance, tax exoneration and logistics.

5.2. The Master Document is enclosed as **Annex 2** and the Purchase Order to INABATA is enclosed as **Annex 3**.

5.3. The final data sheet of the Fence and Gate is enclosed as **Annex 5.**

## 6. CLAIMS FOR DEFICIENCIES AND LIABILITY

6.1. CONTRACTOR's liabilities and warranties according to §9 in the EPC contract remains unchanged regardless on the Price Adjustment.
The Contractor provides the full system warranty of five (5) years from Commissioning. The Contractor will be single point of contact for all issues regarding deficiencies.

6.2. All the other formulations and agreements in the EPC contract dated on the 29/30.04.2016 including the annexes 2.1.1 "Scope of Work" and 2.1.2 "List of Components" are still valid.

6.3. To secure the payments it is agreed that INABATA/INABATA's Bank will provide a transferable LC to secure the payments. The terms and condition will be negotiated between Inabata´s bank and MKG´s bank (DZ Bank Stuttgart). The terms and conditions are agreed with Inabata as follows: DAP Puerto Sandino, Nicaragua, 65% when providing shipment documents (BOL), 35% by delivery on site (DAP).

## 7. REVISED PROJECT TIMETABLE

7.1. If the deadlines for the completion of the DC installation is on January 20th 2016. The for total installation and commissioning is on March 20th 2016.

7.2. In case of delay beyond the completion dates in 7.1, the Contractor shall pay delay damages as defined in the EPC contract §7.7.

7.3. Following is a partial list of relevant events/estimated completion dates in 2016:
7.3.1. Sales Agreement with INABATA                September 21st

Amendment No. 001 to the EPC-Contract

7.3.2.  INABATA issues Letter of Credit to MKG    September 23rd-28th

7.3.3.  Shipping *)    September 30th/October 15th

7.3.4.  Project start of on-site Construction *)    Mid October / Mid November

    *) Respectively for the Show case and the normal project delivery

The revised time plan is enclosed as **Annex 4**. The parties have agreed to use their best effort to improve the time plan. The revised time plan is based on the above mentioned deadlines.

## 8.  REVISED SCHEDULE OF PAYMENTS TO CONTRACTOR

8.1. Based upon the mutually agreed upon revisions, changes and amendments contained herein, payments to the Contractor upon achievement of certain milestones is estimated as follows:

|  | Other main Components | BOS installation *Estimated*) | Total |
|---|---|---|---|
|  | INABATA | Gespa Nicaragua |  |
| Upon signing this amendment | 0,00 € | 100.000,00 € | **100.000,00 €** |
| Shipping of components | 3.065.507,57 € | 0,00 € | **3.065.509,57 €** |
| Construction start/ delivery on-site | 1.650.657,92 € | 0,00 € | **1.650.657,92 €** |
| By acceptance |  | 543.136,20 € | **543.136,20 €** |
|  | 4.716.165,49 € | 643.136,20 € | **5.359.301,69 €** |

*) Actual cost plus/minus in accordance with §4.2

## 9.  GENERAL PROVISIONS

9.1. All terms used in this Letter Agreement shall have the same meaning as defined in the EPC contract.

9.2. The terms and conditions of the EPC contract shall remain unaffected.

9.3. This Agreement or any provision hereof may be amended, terminated or waived only in writing executed by all Parties.

9.4. This Agreement shall be governed by and construed in accordance with the laws of the Kingdom Netherlands under exclusion of the conflict of law principles and of the United Nations Convention on Contracts for the International Sale of Goods - CISG.

Amendment No. 001 to the EPC-Contract



9.5. The court of jurisdiction for any dispute arising out of or relating to this Letter Agreement, or the validity thereof shall be the Kingdom of Netherlands

Signed and executed by the duly authorized representative of each Party hereto on the date and at the location recited below.
Signing page:

**Contractor:**
**MKG GmbH Montagebau Karl Göbel**

Date/Location: _Öhringen 23.09.16_

MKG GmbH
Falko Schrade
Man. Director

**Principal/Client:**
**GESPA Nicaragua S.A.:**

Date/Location: _Öhringen 23.09.16_ Date/Location: _____

Gespa Nicaragua S.A.
Jim Jakobsen
President

Gespa Nicaragua S.A.
Scarlett Nygart
Secretary

Amendment No. 001 to the EPC-Contract